**No. 12-14009-FF**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————————————————————

DR. BERND WOLLSCHLAEGER, *et al.,*

*Plaintiffs-Appellees,*

v.

GOVERNOR STATE OF FLORIDA, *et al.,*

*Defendants-Appellants.*

———————————————————————————

Appeal from the United States District Court for the
Southern District of Florida
Case No. 11-22026-Civ. (Honorable Marcia G. Cooke)

———————————————————————————

## EN BANC BRIEF OF AMICI CURIAE SECOND AMENDMENT FOUNDATION AND CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS SUPPORTING APPELLANTS AND REVERSAL

———————————————————————————

Joseph G.S. Greenlee
Law Offices of David A. Helmer, LLC
611 Main Street
Frisco, CO 80443
(970) 485-3303
JosephGreenlee@gmail.com

Counsel for *Amici Curiae* Second Amendment Foundation and Citizens
Committee for the Right to Keep and Bear Arms

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* hereby state that they have no parent companies, trusts, subsidiaries, and/or affiliates that have issued shares or debt securities to the public.

Pursuant to Eleventh Circuit Rule 26.1-1, in addition to the list of interested parties contained in the Appellants' Brief, the undersigned counsel for *Amici* hereby certifies that, to the best of his knowledge, the following persons, firms, and associations may also have an interest in the outcome of this case as *amici curiae* or its counsel:

The Second Amendment Foundation, a non-profit organization that has no parent companies and issues no stock;

The Citizens Committee for the Right to Keep and Bear Arms, a non-profit organization that has no parent companies and issues no stock;

Joseph G.S. Greenlee, counsel for *Amici Curiae*.


/s/ Joseph G.S. Greenlee
Joseph G.S. Greenlee
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT……….…………………………..C1 of 1
TABLE OF CITATIONS……………………………………………………ii
PRELIMINARY STATEMENT……………………………………………....1
INTERESTS AND IDENTITY OF *AMICI CURIAE*………….……………1
CONSENT TO FILE……….…………………………………………………1
SUMMARY OF ARGUMENT……………………………………………….2
ARGUMENT……………………………………………………………….3
I.    THE PROPER TEST FOR EVALUATING PROFESSIONAL
      SPEECH REGULATIONS IS THE *GENTILE* BALANCING
      TEST……………………………………………………………….3
II.   PLAINTIFFS' FIRST AMENDMENT INTEREST IS
      DRAMATICALLY OUTWEIGHED BY THE STATE'S
      COMPELLING INTEREST…………………………………….……12
III.  THE STATE HAS A COMPELLING INTEREST IN
      REGULATING PHYSICIAN SPEECH……………………….…....15
      A.    THE REGULATION OF THE PRACTICE OF
            PROFESSIONS – INCLUDING PROFESSIONAL SPEECH
            – HAS LONG BEEN RECOGNIZED AS A COMPELLING
            STATE INTEREST……………………………………..……16
      B.    THE STATE HAS A COMPELLING INTEREST IN
            MAINTAINING THE ETHICAL STANDARDS OF
            PHYSICIANS…………………………………………………17
      C.    THE STATE HAS A COMPELLING INTEREST BASED ON
            THE IMBALANCE OF POWER INHERENT TO THE
            DOCTOR-PATIENT RELATIONSHIP……….……………….26
      D.    GREATER REGULATION IS NEEDED FOR
            PROFESSIONAL SPEECH……………………………………32
CONCLUSION……………………………………………….................35
CERTIFICATE OF COMPLIANCE…………………………………………36
CERTIFICATE OF SERVICE…………………………………………………36

## <u>TABLE OF CITATIONS</u>

**CASES**

*Accountant's Soc. of Virginia v. Bowman*,
   860 F.2d 602 (4th Cir. 1988)………………………………………………..4

*Bates v. State Bar of Arizona*,
   433 U.S. 350 (1977)…………………………………………………10, 11, 13, 30

*Conant v. McCaffrey*,
   No. C 97-00139 WHA, 2000 WL 1281174 (N.D. Cal. Sept. 7, 2000)..33

*Gentile v. State Bar of Nevada*,
   501 U.S. 1030 (1991)……………………………………………2, 4, 5, 7, 8, 9, 11

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975)…………………………………………...4, 12, 16

*Edenfield v. Fane*,
   507 U.S. 761 (1993)………………………………………………25, 30

*Evergreen Ass'n, Inc. v. City of New York*,
   740 F.3d 233 (2d Cir.)……………………………………………………4

*Friedman v. Rogers*,
   440 U.S. 1 (1979)………………………………………………8, 10, 11

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)……………………………………………………19

*In re Rouss*,
   221 N.Y. 81 (1917)……………………………………………………32

*In re Sawyer*,
   360 U.S. 622 (1959)……………………………………………...35

*Locke v. Shore*,
   634 F.3d 1185 (11th Cir. 2011)………………………………………5

*Lowe v. S.E.C.*,
   472 U.S. 181 (1985)……………………………………………...33

*Nat'l Soc. of Prof'l Engineers v. United States*,
   435 U.S. 679 (1978)……………………………………………………25

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978)………………………………………………....7, 31

*Peel v. Attorney Registration & Disciplinary Comm'n of Illinois*,
   496 U.S. 91 (1990)………………………………………….......11, 13, 30

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2013)……………………………………..4, 34, 35
*Planned Parenthood of Se. Pennsylvania v. Casey*,
    505 U.S. 833 (1992)…………………………………………………………6, 7
*Seattle Times Co. v. Rhinehart*,
    467 U.S. 20 (1984)……………………………………………………………9
*Shapero v. Kentucky Bar Ass'n*,
    486 U.S. 466 (1988)……………………………………..…30, 31, 32
*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)…………………………………………… 10, 13
*Watson v. State of Maryland*,
    218 U.S. 173 (1910)………………………………………………………...19
*Wollschlaeger v. Farmer*,
    880 F. Supp. 2d 1251 (S.D. Fla. 2012)……………………….12, 13, 14
*Wollschlaeger v. Governor of the State of Florida*,
    No. 12-14009, 2015 WL 8639875 (11th Cir. Dec. 14, 2015)....14, 21, 33
*Wooley v. Maynard*,
    430 U.S. 705 (1977)………………………………………………………7
*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)…………………………………………30, 31

## STATUTES

Fla. Stat. Ann. § 790.338(2)………………..……………………...3, 12, 13
Fla. Stat. Ann. § 790.338(4)……………………………………………...13

## OTHER AUTHORITIES

AAFP, Firearms and Safety Issues………………………………………23
AAFP and Center to Prevent Handgun Violence, *Keep Your Family Safe From Firearm Injury* (1996)……………………………………………23
ACP, *ACP Ethics Manual Sixth Edition*………………………………...28, 32
American Academy of Pediatrics, Committee on Injury and Poison Prevention, *Firearm injuries affecting the pediatric population*, 89 pt. 4 Pediatrics 788 (Apr. 1992)……………………………………………22

American Medical Association, *Code of Medical Ethics: Opinion 10.015 – The Patient-Physician Relationship* (2001)……………………....…18

APA, *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry* (2013 Edition)………………………………...28

*Carol Nadelson and Malkah T. Notman*, *Boundaries in the Doctor-Patient Relationship*, 23 pt. 3 Theoretical Medicine and Bioethics 191 (May 2002)…………………………………………………………………..29

Christine Laine, *A Resolution for Physicians: Time to Focus on the Public Health Threat of Gun Violence*. Annuals of Internal Medicine, Annals of Internal Medicine, Mar. 19, 2013……………………………24

Frick, D., *Nonsexual Boundary Violations in Psychiatric Treatment*, 13 Review of Psychiatry 415 (1994)……………………………………27, 32

Glen O. Gabbard and Carol Nadelson, *Professional Boundaries in the Physician-Patient Relationship*, 273 pt. 18 Journal of the American Medical Association 145 (May 10, 1995)………………………………...29

Ian R. Holzman, *Pediatrician-Family-Patient Relationships: Managing the Boundaries*, 124 pt. 6 Pediatrics 1685 (Dec. 2009)………………..29

Janice Somerville, *Gun Control as Immunization*, AMERICAN MEDICAL NEWS, Jan. 3, 1994……………………………………………23

Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201 (1994)……………………………………………………………27

Post, Robert, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939 (2007)…………………………………………………………......5, 16, 33, 34

Richard Harris, *A Reporter at Large: Handguns*, THE NEW YORKER, July 26, 1976……………………………………………………………..22

Schauer, Frederick, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience,* 117 Harv. L.Rev. 1765 (2004)……………………………………………………..…………5

## PRELIMINARY STATEMENT

The Second Amendment Foundation and Citizens Committee for the Right to Keep and Bear Arms respectfully submit this brief as *amici curiae* in support of Appellants, to urge the Court to reverse the district court's order enjoining the Firearms Owners' Privacy Act (the "Act").

## INTERESTS AND IDENTITY OF *AMICI CURIAE*

The Second Amendment Foundation and Citizens Committee for the Right to Keep and Bear Arms are non-profit corporations dedicated to promoting the benefits of the right to keep and bear arms. How the medical profession may be regulated to protect the Second Amendment directly impacts the organizations' interests, and the interests of their members and supporters, who enjoy exercising their Second Amendment rights. The organizations' expertise in the field of constitutional rights would aid the Court. No counsel for a party in this case contributed to this brief. No party or counsel for a party contributed money intended to fund the preparation and submission of this brief. No person other than *amici curiae* and their members contributed money intended to fund preparing or submitting this brief.

## CONSENT TO FILE

All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court has established the test for professional speech regulations: a balancing test weighs the State's interest in regulating the professional speech against the professional's First Amendment interest. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1073 (1991). The Court has consistently applied this balancing test to professional speech cases like this one. And since the Court has further established that states have a compelling interest in regulating professions, and that professionals have diminished First Amendment rights, the scale is tipped heavily in favor of the State when conducting the balancing test. This is demonstrated by the cases in which the Court has applied the test, as the Court has upheld every law that simply furthered the State's interest.

Applying the balancing test to this case, the State's interest easily outweighs the Plaintiffs'.

The Act does not prevent any physician from saying anything about firearms. Physicians may still warn of the dangers of firearms, offer their opinions about firearms, and even advise their clients that they

would be better off without firearms. The only thing a physician may *not* do, is demand or record personal information from the patient regarding firearm ownership. Even that limitation applies only when the physician does not "in good faith believe[] that this information is relevant." Fla. Stat. Ann. § 790.338(2). Put simply, the only restriction on Plaintiffs' First Amendment rights is the inability – while practicing their profession – to inquire about something they do not even believe to be relevant.

The State, conversely, has a compelling interest in regulating the professions, to ensure that its licensed professionals are acting ethically, and not harming the public. This is especially important for the medical profession, because the unique position of power of physicians, and the dependency and vulnerability of patients.

## ARGUMENT

## I.    THE PROPER TEST FOR EVALUATING PROFESSIONAL SPEECH REGULATIONS IS THE *GENTILE* BALANCING TEST.

The Supreme Court has imparted the proper way to resolve this case. In professional speech cases,[1] the Court applies a balancing test that weighs the State's interest in regulating the profession against the professional's First Amendment interest.[2] Because the Court has declared that "the States have a compelling interest in the practice of professions,"[3] while professionals have diminished First Amendment rights,[4] the scale is tipped in favor of the State in professional speech

---

[1] Professional speech cases are often inextricably intertwined with commercial speech cases. This Part I takes care to focus on those cases the Court addressed in the professional speech context.

[2] This test will hereinafter be referred to as the "*Gentile* Balancing Test." As the Court explained in *Gentile*, 501 U.S. at 1073, the Court had been utilizing the test for years before *Gentile*. Since recent courts (including the district court) have referred to the balancing test as the *Gentile* test, this brief will do the same.

[3] *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).

[4] *See Gentile*, 501 U.S. at 1074 (acknowledging that prior Supreme Court cases "rather plainly indicate that the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press"); *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 245 (2d Cir. 2014) (noting that under Supreme Court precedent, "a lesser degree of scrutiny applies to compelled disclosures in the context of campaign finance regulation, the regulation of licensed physicians, and commercial speech") (internal citations omitted); *Accountant's Soc. of Virginia v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) ("Professional regulation is not invalid, nor is it subject to first amendment strict scrutiny, merely because it restricts some kinds of speech"); *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2013) ("the First Amendment

cases. Thus, in prior cases, as long as the law furthers the State's interest, it has been upheld.

In *Gentile*, the Court explained that in professional speech cases it utilized this balancing test: "In [prior] cases, we engaged in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue." *Id.* at 1073. The Court then applied the balancing test to uphold a rule preventing lawyers from making certain extrajudicial statements to the press. Weighing the lawyer's First Amendment interest, the Court determined that "the regulation of [] speech is limited" and acknowledged that its previous cases "rather plainly indicate that the speech of lawyers representing clients in

---

tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it"); Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 949 (2007)("The difference between professional speech and speech by a professional is constitutionally profound."); Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience,* 117 Harv. L.Rev. 1765, 1783–84 (2004) (concluding that professional regulations have primarily been viewed as falling outside the scope of the First Amendment). This Court has similarly recognized that professional speech deserves less protection. *See Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) ("There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients").

pending cases may be regulated under a less demanding standard." *Id.* at 1074, 1076. Weighing the State's interest, the Court determined it had a "substantial interest" in preventing the potential consequences of the speech. *Id.* at 1075. Since the law furthered that interest, it was upheld.

In *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992), the Court swiftly rejected a First Amendment claim asserted by a physician forced to speak by the law, without applying the strict scrutiny analysis advocated by the plaintiffs:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. *To be sure, the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.* We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Id.* at 884 (internal citations omitted) (emphasis added). Undoubtedly, the Court would normally apply strict scrutiny to a law forcing a private

person to speak.[5] But since the burden was on professional speech, it was viewed within the context of a regulation on "the practice of medicine, subject to reasonable licensing and regulation by the state." And since the Court had already determined that forcing the physician to speak "furthers the [State's] legitimate purpose,"[6] the law was upheld and the Court's succinct analysis was sufficient.

Similarly, in *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978), the Court upheld a disciplinary rule prohibiting the in-person solicitation of clients by lawyers after weighing the lawyer's First Amendment interest against the State's interest in regulating the profession.[7] The lawyer's First Amendment interest was considered within the context of his status as a professional:

> A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. *It falls within the State's proper sphere of economic and professional regulation.* While entitled to *some* constitutional protection,

---

[5] *See Wooley v. Maynard*, 430 U.S. 705 (1977) (applying strict scrutiny to a law requiring a private person to display the state motto on his license plate).

[6] *Casey*, 505 U.S. at 883.

[7] The Court acknowledged in *Gentile*, 501 U.S. at 1073, that it utilized the *Gentile* Balancing Test in *Ohralik*.

> appellant's conduct is subject to regulation
> in furtherance of important state interests.

*Id.* at 459 (emphasis added). Here again, the Court gave less weight to the First Amendment interests because only *professional* speech was implicated. The Court then considered the State's interest in regulating the profession.

> The state interests implicated in this case are particularly strong. In addition to its general interest in protecting consumers and regulating commercial transactions, *the State bears a special responsibility for maintaining standards among members of the licensed professions.*

*Id.* at 460 (emphasis added). The Court found the State had a "legitimate and indeed compelling" interest in regulating the professional speech. *Id.* at 462 (internal quotations omitted). After determining the regulation furthered the State's interest, the Court upheld the law.

Soon after, in *Friedman v. Rogers*, 440 U.S. 1 (1979), the Court upheld a prohibition on the practice of optometry under a trade name. As it later did in *Gentile*, the Court recognized that its precedent established a test for such cases in which it "weigh[ed] the First Amendment interests…against the State's interests in regulating the

8

speech in question." *Id.* at 9. The Court weighed the State's interest and determined that, "the State's interest in protecting the public from the deceptive and misleading use of optometrical trade names is substantial and well demonstrated." *Id.* at 15. The Court weighed the First Amendment interests and determined that "the restriction on the use of trade names has only the most incidental effect." *Id.* at 15-16. Since the State's interest outweighed the First Amendment interest, and since the law preventing misleading trade names furthered the interest of providing consumers more accurate information, the law was upheld.

Later, in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), the Court upheld a law prohibiting litigants from disseminating information obtained through the discovery process.[8] The State's interest in protecting the integrity of the discovery process outweighed the litigant's First Amendment interest – which was implicated "to a far lesser extent than [it] would [be by] restraints on dissemination of information in a different context." *Id.* at 34. And since prohibiting the dissemination of information obtained through the discovery process

---

[8] The Court acknowledged in *Gentile*, 501 U.S. at 1073, that it utilized the *Gentile* Balancing Test in *Seattle Times*.

furthered the State's interest in protecting the discovery process, the law was upheld.

Conversely, when the professional speech regulation does not further the State's interest in regulating the profession, the Court rejects the law.

In *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), the Court struck a ban on advertising prescription drug prices. The Court established that, "Indisputably, the State has a strong interest in maintaining th[e] professionalism" of licensed pharmacists, but found that "The advertising ban does not directly affect professional standards one way or the other." *Id.* at 766, 769. The regulation did not further the State's interest, so it was struck.[9]

A year later, in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), the Court rejected a blanket suppression of attorney advertising after

---

[9] The Court acknowledged in *Friedman*, 440 U.S. at 8-9, that it utilized the *Gentile* Balancing Test in *Virginia Pharmacy*.

balancing the interests and determining the regulation did nothing to further the State's interest in regulating the legal profession.[10]

In *Peel v. Attorney Registration & Disciplinary Comm'n of Illinois*, 496 U.S. 91 (1990), the Court rejected a rule prohibiting a lawyer from presenting himself as a trial specialist.[11] The Court weighed the professional's First Amendment interest of disseminating accurate information against the State's interest in preventing consumers from being misled. *Id.* at 91. Because the lawyer's speech was not misleading, the law was unconstitutional. *Id.* at 102-103.

Despite having many opportunities to do so, the Court has not utilized a generic heightened scrutiny standard for professional speech challenges. Instead, the Court has repeatedly applied the *Gentile* Balancing Test, repeatedly stating that only this simple test is required. The Court has further elucidated that the scale is tipped in favor of the State, by establishing that "the States have a compelling interest in the

---

[10] The Court acknowledged in *Friedman*, 440 U.S. at 9, and *Gentile*, 501 U.S. at 1073, that it utilized the *Gentile* Balancing Test in *Bates*.

[11] The Court acknowledged in *Gentile*, 501 U.S. at 1073, that it utilized the *Gentile* Balancing Test in *Peel*.

practice of professions"[12] and consistently according professionals limited First Amendment protection;[13] and by upholding professional speech restrictions so long as they further the State's interest.

## II. PLAINTIFFS' FIRST AMENDMENT INTEREST IS DRAMATICALLY OUTWEIGHED BY THE STATE'S COMPELLING INTEREST.

The Act does not prevent physicians from speaking with patients about firearms.[14] Physicians can give patients any advice or information regarding firearms they desire. In fact, physicians can treat and advise every patient as if they were firearm owners, or potential firearm owners. Further, if a physician in good faith believes that a patient's firearm ownership is relevant, the physician may inquire about it.[15] If a

---

[12] *Goldfarb*, 421 U.S. at 792.

[13] *See supra* text accompanying note 4.

[14] The district court derided the Act for "aim[ing] to restrict a practitioner's ability to provide truthful, non-misleading information to a patient (or record such information), whether relevant or not at the time of the consult with the patient." *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1263 (S.D. Fla. 2012). But the Act does no such thing. The Act in no way prevents physicians from saying whatever they want about firearms.

[15] § 790.338(2) ("a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry").

patient wants to talk about firearm ownership, the physician may freely engage in that discussion. The Act does nothing to alter the way physicians select their patients.[16] Thus, a physician is restricted *only* from inquiring or keeping records about firearm ownership when the physician believes the information is irrelevant to the patient's care.

Surely a physician does not have a compelling interest in asking about or recording private information that is unrelated to the patient's care—a less compelling interest is difficult to imagine. By comparison, the cases in which the Court determined the professional's First Amendment interest outweighed the State's interest – *Peel*, *Virginia Pharmacy*, and *Bates* – all focused on preventing harms to the listener. These cases ensured that an imperative and forthright message was being conveyed. The Plaintiffs' interest is directly contrary to the type of

---

[16] § 790.338(4). The district court determined, "the State's interest in preventing discrimination is dubious because…the law does not prevent a physician from terminating the doctor-patient relationship if a patient refuses to answer questions regarding firearm ownership. The antidiscrimination provision therefore provides only remote, if any, support for the State's asserted purpose." *Farmer*, 880 F. Supp. 2d at 1265. But this overlooks the fact that substantially fewer patients will be in such a position since the Act only allows a physician to inquire about firearm ownership if she "in good faith believes that this information is relevant to the patient's medical care or safety." § 790.338(2).

interest validated by the Court. The restricted speech is unnecessary, and rather than prevent harm, it often causes harm by leading to harassment, discrimination, and a deterioration of the doctor-patient relationship. Indeed, the Plaintiffs themselves have admitted that their patients sometimes get upset over firearm inquiries.[17]

The district court applied the *Gentile* Balancing Test and found that the Plaintiffs' First Amendment interest outweighs the State's. *Farmer*, 880 F. Supp. 2d at 1265-67. The court based its decision on its determination that:

> This law chills practitioners' speech in a way that impairs the provision of medical care and may ultimately harm the patient ... The restrictions at issue here are especially problematic because, as Plaintiffs note, there may be cases where, unless the practitioner makes an initial inquiry about firearms (albeit with no good faith basis, at the time of the questioning, that it is relevant), the patient may not know to raise the issue herself and may not receive appropriate, possibly life-saving, information about firearm safety. These considerations persuade me that the

---

[17] *See Wollschlaeger v. Governor of the State of Florida*, No. 12-14009, 2015 WL 8639875, at *32 n. 5 (11th Cir. Dec. 14, 2015) (explaining that because of the Act, Dr. Schectman now refrains from asking follow-up questions when patients get "upset" and Dr. Gutierrez refrains when patients seem "disinclined").

> balance of interests tip significantly in favor
> of safeguarding practitioners' ability to
> speak freely to their patients.

*Id.* at 1267. Essentially, the district court found it "especially problematic" that a physician could not make an initial inquiry into a topic that both the physician and the patient believe to be entirely insignificant. The district court determined that protecting patients from harassment, discrimination, and a damaged doctor-patient relationship was outweighed by the physician's inability to inquire about a possible threat so obscure that neither the physician nor patient has any reason to believe it exists. This is an absurd result, made worse by the fact that the Act does not actually prevent physicians from informing patients about the dangers of firearms—it only prevents physicians from asking if the patient owns a firearm, and making record of it; and only then when the physician does not believe it is relevant. The Act is an extremely narrow law that only affects speech that physicians have no legitimate interest in.

### III.   THE STATE HAS A COMPELLING INTEREST IN REGULATING PHYSICIAN SPEECH.

#### A.   THE REGULATION OF THE PRACTICE OF PROFESSIONS – INCLUDING PROFESSIONAL SPEECH – HAS LONG BEEN RECOGNIZED AS A COMPELLING STATE

## INTEREST.

The Supreme Court has made clear that states have a compelling interest in regulating professions.

> We recognize that the States have a *compelling interest* in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for…regulating the practice of professions.

*Goldfarb*, 421 U.S. at 792 (emphasis added).

Professional speech is inherent to the practice of a profession.[18] "The practice of medicine, like all human behavior, transpires through the medium of speech. In regulating the practice, therefore, the state must necessarily also regulate professional speech."[19] Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 950-51 (2007) (internal citations omitted). Thus, because the states have a compelling interest

---

[18] *See* Post, *supra* note 4, at 949 ("when a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practice of medicine").

[19] *Id.* at 950.

16

in regulating the practice of professions, they have a compelling interest in regulating professional speech.

Indeed, professional speech regulations are often applied to physicians without question.

> Without so much as a nod to the First Amendment, doctors are routinely held liable for malpractice for speaking or for failing to speak. Doctors commit malpractice for failing to inform patients in a timely way of an accurate diagnosis, for failing to give patients proper instructions, for failing to ask patients necessary questions, or for failing to refer a patient to an appropriate specialist. In all these contexts the regulation of professional speech is theoretically and practically inseparable from the regulation of medicine.

*Id.* at 950-51.

## B.    THE STATE HAS A COMPELLING INTEREST IN MAINTAINING THE ETHICAL STANDARDS OF PHYSICIANS.

Throughout the ages a clear ethical imperative has guided physicians—the physician must place the patient's interests above her own. Echoes of the admonition from ancient times are heard in the Hippocratic Oath[20] and the Prayer of Maimonides,[21] with their advice

---

[20] The Hippocratic Oath is an ethical code written in the 5th Century B.C. that has been adopted by the medical profession throughout the

for doctors to avoid impropriety and to resist corrupting outside influences that could compromise trust.

Centuries later, the requirement for physicians to keep the interests of their patients of paramount importance remains the sine qua non of the modern day practice of medicine. "The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obligations to other groups, and to advocate for their patients' welfare." American Medical Association, *Code of Medical Ethics: Opinion 10.015 – The Patient-Physician Relationship* (2001) http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion10015.page, (last visited Mar. 20, 2016). This duty is integral to the official policies of major medical organizations. This duty is the reason legislatures impose substantial regulations on the medical profession in every state across the country.

---

ages. Greek Medicine: The Hippocratic Oath, https://www.nlm.nih.gov/hmd/greek/greek_oath.html (last visited Mar. 20, 2016).

[21] The Prayer of Maimonides is another centuries old traditional oath for physicians. Prayer of Maimonides, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1593332/ (last visited Mar. 20, 2016).

And this duty is the reason the Court has emphasized that a State's interest in regulating the medical profession is especially compelling:

> It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health. *There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine.*

*Watson v. State of Maryland*, 218 U.S. 173, 176 (1910) (emphasis added).[22]

Physicians have long been held to a higher standard than the rest of society through both government regulation and self-regulation. And the judiciary has long approved of this regulation.[23] This is because the extensive education, specialized knowledge, and presumed honesty and integrity required of a physician places physicians in a societal position unmatched in importance and esteem.

Indeed, physicians occupy the most highly regarded positions in society, and they are expected to fulfill their roles with the utmost

---

[22] *See also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession").

[23] *See supra* Part III.A.

competence and rectitude. That is why patients confidently trust and depend on physicians; and that trust and dependence is why the State's interest in regulating physician speech is so compelling. When physicians abuse their respected positions, all of society suffers. That suffering reaches its apex when patients in need of care are deprived of medical services—whether through blatant discrimination or through a physician-patient relationship so damaged that patients hesitate to seek the care they need.

The Act was passed as a needed response to both obvious discrimination and harms more difficult to detect and prevent that arose from the damaged physician-patient relationship.[24] The Florida legislature became aware of unethical behavior by Florida physicians,

---

[24] In passing the Act, Florida's legislature considered numerous incidents in which patients were mistreated by physicians based on the exercise of their fundamental right to own a firearm. The legislature noted an incident in which a mother was ordered to find another pediatrician for her child because she refused to answer a question about firearm ownership; an incident in which a physician deprived medical care to a nine-year-old because the physician wanted to know about the family's firearms; an incident in which a father was asked to dispose of his firearm; an incident in which a patient was lied to about having to disclose firearm ownership information as a Medicaid requirement; and an incident in which a child was separated from the mother so the child could be grilled about the mother's firearm ownership. *Wollschlaeger*, No. 12-14009, 2015 WL 8639875 at *32 n.2.

and it acted on its obligation to protect its citizens from that unethical behavior.

The physician conduct was unethical not only because inquiring about firearm ownership when it was completely unrelated to a patient's care was known to sometimes lead to patient mistreatment (while providing no benefits whatever), but also because such inquiries were strictly motivated by a political agenda.

A fundamental defense of the practice of physicians questioning and advising their patients about firearms in their homes is that such practices are the so-called standard of care – and the official policies of certain medical organizations are offered for support. But the history of these policies and how they came into being shows an institutional motivation in unrestrained political advocacy for gun control, up to and including firearm bans.

Three of the plaintiffs in this case are the state chapters of the American Academy of Pediatrics (AAP), the American Academy of Family Physicians (AAFP), and the American College of Physicians (ACP). Each of these national physician organizations has official policies condemning firearm ownership.

The AAP has previously proclaimed support for legislative and regulatory "measures [that] might include restrictions on the private purchase of handguns and restrictions on the possession of handguns within the home (up to and including bans)." American Academy of Pediatrics, Committee on Injury and Poison Prevention, *Firearm injuries affecting the pediatric population*, 89 pt. 4 Pediatrics 788, 789 (Apr. 1992). The AAP has also partnered with the Center to Prevent Handgun Violence (now known as the Brady Center) which was the education and litigation arm of Handgun Control, Inc. (now known as the Brady Campaign). At the time the partnership was established, Handgun Control, Inc. was the premier political advocacy group dedicated to banning handguns.[25] The groups established a public relations campaign called STOP, for "Steps to Prevent Firearm Injury." The branded campaign distributed packets of brochures, posters,

---

[25] Handgun Control, Inc.'s chairman described the group's long-term plan as follows: "The first problem is to slow down the increasing number of handguns being produced and sold in this country. The second is to get handguns registered. And the final problem is to make the possession of all handguns and all handgun ammunition—except for the military, policemen, licensed security guards, licensed sporting clubs, and licensed gun collectors—totally illegal." Richard Harris, *A Reporter at Large: Handguns*, THE NEW YORKER, July 26, 1976, at 58.

counseling tip sheets, and audiotapes carrying the no-guns message central to the AAP's policy—"*The safest thing is to not have a gun in your home, especially not a handgun.*"[26] The advice is given with complete disregard for personal or family decisions about home defense, matters that physicians are dangerously unqualified to advise on.

The AAP's longtime firearms policy leader, Dr. Katherine Christoffel, further illustrated the AAP's enmity towards firearms by once exclaiming that "Guns are a virus that must be eradicated."[27] Dr. Christoffel was the founder and director of HELP, the Handgun Ownership Lowering Plan, a group dedicated to handgun control.

The AAFP has official policy stating, "The Academy opposes private ownership of weapons designed primarily to fire multiple (greater than 10) rounds quickly." AAFP, Firearms and Safety Issues, http://www.aafp.org/about/policies/all/weapons-laws.html (last visited Mar. 20, 2016). This deliberate policy includes most pistols designed in

---

[26] AAFP and Center to Prevent Handgun Violence, *Keep Your Family Safe From Firearm Injury* (1996), http://stonebridgepediatrics.com/wp-content/uploads/2013/05/FirearmInjury_HE0163.pdf (last visited Mar. 20, 2016).

[27] Janice Somerville, *Gun Control as Immunization*, AMERICAN MEDICAL NEWS, Jan. 3, 1994, at 9.

the last quarter century and virtually all rifles designed and produced after the Korean War.

The ACP has demonstrated animosity for firearms favored by millions of Americans for self-defense, sport, and hunting; previously showing support for "strong legislation to ban automatic and semiautomatic assault weapons" and "restrictions on the sale and possession of handguns." Christine Laine, *A Resolution for Physicians: Time to Focus on the Public Health Threat of Gun Violence*. Annuals of Internal Medicine, Annals of Internal Medicine, Mar. 19, 2013.

The Plaintiff organizations' involvement in this lawsuit further reveals their desire to push an anti-gun message. As explained in Part II, *supra*, the Act does not prevent physicians from conveying any information regarding firearms whatever, it simply prohibits inquiring about and keeping records of actual ownership by patients. The only conceivable reason for wanting to engage in the prohibited conduct is to single out firearm owners for specially unfavorable treatment.

The Plaintiff organizations' policies demonstrate that their desire to inquire about firearm ownership is politically motivated. And since

patients gain nothing from such inquiries,[28] and are instead often harmed by such inquiries,[29] the physicians are clearly placing their own interests above their patients'. This is unethical, and the State had a duty to affect a remedy. The Court has "given consistent recognition to the State's important interests in maintaining standards of ethical conduct in the licensed professions."[30]

The bottom line is the practice of inquiring and keeping records about firearm ownership was resulting in unethical behavior by Florida physicians, and the Florida legislature passed the Act to fulfill its obligation of ensuring that the professionals practicing within its boundaries act with the dignity required of them.

## C. THE STATE HAS A COMPELLING INTEREST BASED ON THE IMBALANCE OF POWER INHERENT TO THE DOCTOR-PATIENT RELATIONSHIP.

---

[28] It cannot be emphasized enough that the Act does not prevent physicians from conveying any information regarding firearms. It only prevents inquiries and record keeping about firearm ownership when the physician herself believes it is irrelevant.

[29] *See supra* text accompanying note 24.

[30] *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). *See also Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 696 (1978) ("Certainly, the problem of professional deception is a proper subject of an ethical canon").

Another reason states have a compelling interest in regulating physician speech is the dramatic imbalance of power inherent to the relationship between a highly trained physician and a relatively uninformed and impuissant layperson.

> [R]esearch shows, the purpose and structure of the doctor-patient relationship vest physicians with immense authority and power in the eyes of patients. Physicians' authority derives from their superior knowledge and education, their prestigious social and economic status, and the "charismatic authority" that derives from their symbolic role as conquerors of disease and death… The confluence of these factors leads to an institutionalization of physicians' "professional dominance" within the structure of doctor-patient interaction that in itself legitimizes physician expressions.
>
> In the face of this dominance, patients suspend their critical faculties and defer to physicians' opinions. Patients' disempowered position stems from a number of factors, including lack of medical knowledge, the anxiety that accompanies illness, and the need to believe that physicians have the power and competence needed to cure them.

Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 225-27 (1994) (citations omitted).

The higher standard of conduct expected of physicians in their dealings with patients stems from a widely recognized behavioral feature of the interaction:

> Generally speaking, treatment boundaries can be defined as the set of rules that establishes the professional relationship as separate from other relationships and protects the patient from harm. A patient who seeks medical or psychiatric treatment is often in a uniquely dependent, anxious, vulnerable and exploitable state. In seeking help, patients assume positions of relative powerlessness in which they expose their weaknesses, compromise their dignity, and reveal intimacies of body or mind, or both.

Frick, D., *Nonsexual Boundary Violations in Psychiatric Treatment*, 13 Review of Psychiatry 415, 416 (1994).

The ACP's Ethics Manual explains that "The patient-physician relationship entails special obligations for the physician to serve the patient's interest because of the specialized knowledge that physicians possess, the confidential nature of the relationship, and the imbalance

of power between patient and physician." ACP, *ACP Ethics Manual Sixth Edition*, https://www.acponline.org/clinical-information/ethics-and-professionalism/acp-ethics-manual-sixth-edition-a-comprehensive-medical-ethics-resource/acp-ethics-manual-sixth-edition (last visited Mar. 20, 2016).

The American Psychiatric Association warns that "the inherent inequality in the doctor-patient relationship may lead to exploitation of the patient" and advises psychiatrists to "diligently guard against exploiting information furnished by the patient and [] not use the unique position of power afforded him/her by the psychotherapeutic situation to influence the patient in any way not directly relevant to the treatment goals." APA, *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*, *http://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/principles-medical-ethics.pdf* (2013 Edition).

The AAP warns, "There is an inherent risk of exploitation for patients or family members who depend on the knowledge and authority of the pediatrician... The success of the doctor-patient or

doctor-family relationship depends on the ability of the patient or family member to trust the pediatrician completely."[31]

Other medical organizations have similarly noted the importance of maintaining boundaries based on the imbalance of power in the doctor-patient relationship. The American Medical Association published an article warning that "physician behaviors may exploit the dependency of the patient on the physician and the inherent power differential."[32] Most importantly, the Court has recognized the tremendous power professionals wield over their clients, and the need to regulate it.

As explicated in Part I, *supra*, the Court holds professional speech regulations to a lower judicial standard than other speech regulations, and in practice the Court only requires the regulations to further the

---

[31] Ian R. Holzman, *Pediatrician-Family-Patient Relationships: Managing the Boundaries*, 124 pt. 6 Pediatrics 1685, 1686 (Dec. 2009), http://pediatrics.aappublications.org/content/pediatrics/124/6/1685.full.pdf (last visited Mar. 20, 2016).

[32] Glen O. Gabbard and Carol Nadelson, *Professional Boundaries in the Physician-Patient Relationship*, 273 pt. 18 Journal of the American Medical Association 145 (May 10, 1995), http://jama.jamanetwork.com/article.aspx?articleid=388355 (last visited Mar. 20, 2016). *See also Carol Nadelson and Malkah T. Notman, Boundaries in the Doctor-Patient Relationship*, 23 pt. 3 Theoretical Medicine and Bioethics 191 (May 2002) ("There are many situations that have the potential to exploit the dependency of the patient on the doctor and the inherent power differential in this relationship").

state interest. Additionally, the Court has identified two factors it finds particularly important.

First, the Court is especially hostile towards professional speech that harms the listener.[33] Second, the Court is very wary of in-person professional speech.[34] Notably, the Act prohibits in-person professional speech that has been shown to harm the listener. Thus, the Act should be viewed most favorably under Supreme Court precedent.

The Court provided a helpful summary of the way it views different modes of communication in *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988).[35]

---

[33] *See Edenfield*, 507 U.S. at 778 (O'Connor, J., dissenting) (Pointing out that recent opinions, including *Bates v. State Bar of Arizona; Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626 (1985); *Shapero v. Kentucky Bar Assn.*; and *Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*, "have been consistently focus[ed] on whether the challenged advertisement directly harms the listener").

[34] *See Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 474-75 (1988) ("The relevant inquiry is not whether there exist potential clients whose 'condition' makes them susceptible to undue influence, but whether the mode of communication poses a serious danger that lawyers will exploit any such susceptibility").

[35] In *Shapero*, the Court permitted the solicitation of legal business via truthful and nondeceptive letters to potential clients that were known to be facing specific legal problems.

In assessing the potential for overreaching and undue influence, the mode of communication makes all the difference. Our decision in *Ohralik* that a State could categorically ban all in-person solicitation turned on two factors. First was our characterization of face-to-face solicitation as "a practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud." *Zauderer,* 471 U.S., at 641, 105 S.Ct., at 2277. See *Ohralik, supra,* 436 U.S., at 457-458, 464-465, 98 S.Ct., at 1919-1920, 1922-1923. Second, "unique ... difficulties," *Zauderer, supra,* 471 U.S., at 641, 105 S.Ct., at 2277, would frustrate any attempt at state regulation of in-person solicitation short of an absolute ban because such solicitation is "not visible or otherwise open to public scrutiny." *Ohralik,* 436 U.S., at 466, 98 S.Ct., at 1924. See also *ibid.* ("[I]n-person solicitation would be virtually immune to effective oversight and regulation by the State or by the legal profession") (footnote omitted). Targeted, direct-mail solicitation is distinguishable from the in-person solicitation in each respect.

*Id.* at 475. Like the speech prohibited in *Ohralik* and unlike the speech permitted in *Shapero*, the Act prohibits face-to-face inquiries that are "rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud." And also like the speech prohibited in *Ohralik* and unlike the speech permitted in *Shapero*, the

Act prohibits in-person speech "not visible or otherwise open to public scrutiny" and "virtually immune to effective oversight and regulation by the State." Therefore, the Act's ban on the perilous and difficult to regulate speech is perfectly appropriate under Supreme Court precedent.

Indeed, the Act remedies a destructive situation that contains all the characteristics that courts and medical organizations have recognized as particularly menacing: In-person communication[36] between a "uniquely dependent, anxious, vulnerable and exploitable"[37] patient and a professional with a "unique position of power…to influence the patient in [a] way not directly relevant to the treatment goals."[38]

## D. GREATER REGULATION IS NEEDED FOR PROFESSIONAL SPEECH.

As Justice Cardozo famously stated, "Membership in the bar is a privilege burdened with conditions." *In re Rouss,* 221 N.Y. 81, 84 (1917). The same could be said for medical professionals. When one accepts the responsibilities of being a physician, that person accepts substantial

---

[36] *See supra, Shapero.*

[37] *See supra, Nonsexual Boundary Violations in Psychiatric Treatment.*

[38] *See supra, ACP Ethics Manual Sixth Edition.*

restraints on their freedom that would not otherwise be permissible.[39]

One example is the limitations on their professional speech.[40]

> The difference between professional speech and speech by a professional is constitutionally profound. The contrast is illustrated by Bailey v. Huggins Diagnostic & Rehabilitation Center, Inc., [952 P.2d 768 (Colo. Ct. App. 1997)] which approves a plaintiff's malpractice action against a dentist for recommending the removal of amalgams in the course of dental treatment even as it invalidates a plaintiff's action for negligent misrepresentation against a dentist who recommended removal of amalgams to "the general public" in a book and TV interview.

---

[39] *See Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) ("The power of government to regulate the professions is not lost whenever the practice of a profession entails speech."). *See also Conant v. McCaffrey*, No. C 97-00139 WHA, 2000 WL 1281174, at *13 (N.D. Cal. Sept. 7, 2000) ("Speech protected on the street corner might not be protected in the professional's venue"); Post, *supra* note 4, at 951 ("Traditional First Amendment values would seem to carry very little force in the context of professional speech. We would be puzzled by a physician who sought to preserve his constitutionally protected 'individual freedom of mind' by refusing to provide his patients necessary and accurate diagnoses, citing for his justification…that 'the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.' Professional speech appears to leave little room for the 'mature individual's sovereign autonomy in deciding how to communicate with others.'") (Internal citations omitted).

[40] Florida law consists of more than a dozen physician speech regulations. *See Wollschlaeger*, No. 12-14009, 2015 WL 8639875 at *32.

Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. at 949 (internal citations omitted). *Bailey* was based on the same sensible reasoning recently articulated by the Ninth Circuit:

> [t]he First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it. And that toleration makes sense: When professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate.

*Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014). To elaborate, First Amendment protection is more deserved by speech that entails the free expression of ideas and furthers public discourse. "But in the context of medical practice we insist upon competence, not debate, and so we subject professional speech to an entirely different regulatory regime. We closely monitor the messages conveyed by professional speech, and we sanction viewpoints that are false." Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. at 949-50. For professionals,

"Obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *In re Sawyer*, 360 U.S. 622, 646-47 (1959) (Stewart, J., concurring).

The purpose of states requiring licenses for professionals is to ensure the general public that its licensees demonstrate the requisite skill, knowledge, and ethical behavior required for a licensed professional in that state. The states create licensed professions for the protection of the public, and the states must regulate the licensed professions for the protection of the public.[41] To fulfill this duty, states must be able to regulate the behavior of their professionals with more leniency than the general public.

## CONCLUSION

The State's compelling interest in regulating professional speech substantially outweighs the Plaintiffs' First Amendment interest, so this Court should reverse the district court's order enjoining the Act.

Respectfully submitted,

/s/ Joseph G.S. Greenlee
Joseph G.S. Greenlee

---

[41] *See Pickup*, 740 F.3d at 1216 n.3 ("Undoubtedly the State possesses an important interest in regulating the professions in the interest of public health, safety, and morals").

Law Offices of David A. Helmer, LLC
P.O. Box 868; 611 Main Street
Frisco, CO 80443
(970) 485-3303
JosephGreenlee@gmail.com

Counsel for *Amici Curiae*
Second Amendment Foundation and
Citizens Committee for the Right to
Keep and Bear Arms

## CERTIFICATE OF COMPLIANCE

I certify pursuant to the Federal Rules of Appellate Procedure 32(a)(7)(c) that the foregoing brief is in 14-point, proportionately spaced Century Schoolbook font. According to the word processing software used to prepare this brief (Microsoft Word), the word count of the brief is exactly 6,961 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Joseph G.S. Greenlee
Joseph G.S. Greenlee
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2016, a true and correct copy of the foregoing, with first class postage prepaid, has been deposited in the U.S. Mail and properly addressed to the persons whose names and

addresses are listed below.  The copies to the Court were delivered via

FedEx overnight delivery.

Douglas H. Hallward-Driemeier
Mariel Goetz
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, D.C. 20006
Telephone: (202) 508-4600

Edward M. Mullins
ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.
701 Brickell Avenue, 16th Floor
Miami, Florida 33131-2847
Telephone: (305) 372-8282

Jonathan E. Lowy
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, D.C. 20002
Telephone: (202) 370-8104

Erin R. Macgowan
Alexandra L. Roth
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Telephone: (617) 951-7000

(*Counsel for Appellees*)

Pam Bondi
Allen C. Winsor
Timothy Osterhaus

Jason Vail
Diane G. DeWolf
Rachel E. Nordby
Office of the Attorney General
PL01 – The Capitol
Tallahassee, Florida 32399-1050

(*Counsel for Appellants*)

/s/ Joseph G.S. Greenlee
Counsel for *Amici Curiae* Second
Amendment Foundation and Citizens
Committee for the Right to Keep and
Bear Arms